IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MOST REVEREND DONALD W. TRAUTMAN, BISHOP OF THE ROMAN CATHOLIC DIOCESE OF ERIE, as Trustee for the Roman Catholic Diocese of Erie, a Charitable Trust; The ROMAN CATHOLIC DIOCESE OF ERIE; ST. MARTIN CENTER, INC. an affiliate nonprofit corporation of Catholic Charities, of the Diocese of Erie; and PRINCE OF PEACE CENTER, INC., an affiliate nonprofit corporation of Catholic Charities of the Diocese of Erie, <br><br> Plaintiffs, <br><br> v. <br><br> KATHLEEN SEBELIUS, in her official Capacity as Secretary of the U.S. Department of Health and Human Services; HILDA SOLIS, in her official Capacity as Secretary of the U.S. Department of Labor; TIMOTHY GEITHNER, in his official capacity as Secretary of the U.S. Department of Treasury; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF LABOR; and U.S. DEPARTMENT OF TREASURY, <br><br> Defendants. | CIVIL ACTION NO. 1:12cv123 Erie <br><br> JURY TRIAL DEMAND <br><br> *Electronically Filed* |

**AMICUS CURIAE BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS ON BEHALF OF CALL TO ACTION PENNSYLVANIA, CATHOLICS FOR SOCIAL JUSTICE, PITTSBURGH AREA PAX CHRISTI AND THE ASSOCIATION OF PITTSBURGH PRIESTS**

Call To Action Pennsylvania, Catholics for Social Justice, Pittsburgh Area Pax Christi and The Association of Pittsburgh Priests hereby file this brief as Amicus Curiae in support of the Motion to Dismiss the Complaint in this action filed by the Defendants.

## I.   Statement of Interest

Call To Action Pennsylvania is an organization of Catholic women and men throughout the Commonwealth of Pennsylvania who support the social ministry of the Church as a local chapter of the National Call To Action Organization. Catholics for Social Justice is an informal organization of more than 75 interested persons who wish to have this brief filed consisting of priests, professed religious and Catholic laywomen and laymen from Pennsylvania and three other states. Pittsburgh Area Pax Christi is an association of Catholic men and women who are affiliated with the National Pax Christi, an organization of Catholics devoted to non-violence and social justice. The Association of Pittsburgh Priests is an association of priests and non-ordained persons from the Catholic Diocese of Pittsburgh who work together in support of the renewal of the Church and peace and justice

All of the Amici are practicing Catholics who care deeply about their faith and who support their parishes and dioceses financially and through personal participation in church activities. They recognize that the tensions between state and church underlying this case have existed since the beginnings of Christianity. When Jesus handed the coin with Caesar's face on it to his questioner and told him that he should pay his tax to Caesar, He was most certainly not endorsing the immoral and repressive conduct of the Roman Empire. This brief is filed because the Amici believe that the position asserted by the Plaintiffs in this case – notwithstanding their good faith and good intentions – gets the relationship between the church and the state wrong. There are several specific concerns in that regard that lead the Amici to file this brief.

First, the Complaint inappropriately inserts the Church into a civil dispute in a manner publicly viewed as partisan. While the plaintiffs have a clear legal right to file their complaint, there are other considerations that strongly suggest the suit should not have been filed. The

Second Vatican Council reminded us in its *Pastoral Constitution On The Church In The Modern World*, that the Church should exercise caution in the exercise of her legal rights when they might "cast doubt on the sincerity of her witness" (N. 76). Becoming embroiled in the public, highly partisan controversy surrounding the issues raised in this Complaint and quoting vitriolic comments of officials of one political party directed at officials of the other political party creates a divisiveness that harms the mission of the Church to serve all people. Second, the Amici are concerned that the Plaintiffs have chosen to join the attack on an important legislative effort to provide universal health care -- a vital human right that Church teaching has supported for decades as a natural right possessed by all people as a matter of social justice. Third, the Amici do not believe that it is unfair to ask the Church in its role as an employer to provide the benefits to employees that all employers must provide, leaving it to the conscience of each employee to determine which services he or she will or will not choose to use. Finally, in terms of the right to free exercise of religion and the right to free speech under the First Amendment, *nothing* in the law impairs the right and the ability of the Church to convey its teaching to its members and indeed to the public at large.

    While these are the concerns that cause the Amici to file this brief, they recognize that the Court must rule only on the legal issues raised by the Complaint. Two of the important legal issues that must be decided and that the Amici address in this Brief are whether the so-called "Government Mandate" violates either (1) the free exercise clause of the First Amendment or (2)

the Religious Freedom Restoration Act.[1]  For the reasons set forth herein, the Amici assert that the law is both constitutional and fully consistent with the Religious Freedom Restoration Act.

## II.     The Government Mandate Does Not Violate the First Amendment Rights of the Plaintiffs.

The elegant but simple words that begin the First Amendment to the Constitution -- "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" -- have over the history of our country proven to be difficult to apply in every case.[2]

Some religiously required or compelled practices have been forbidden by the law, yet the courts have sustained those infringements on religious conduct or observance.  In Reynolds v. United States, 98 U.S. 145 (1879), the Supreme Court held that the practice of polygamy – which the Court recognized to be the religious duty of male members of the Mormon Church, Id. at 161 – was not protected by the First Amendment.  See also Hamilton v. Regents of the University of California, 293 U.S. 245 (1934), where the Court held that students could be compelled to take ROTC classes even though participation in those classes violated the religious teachings of their Church.

On the other hand, the Supreme Court has also found that the First Amendment protected religious practices or beliefs against laws interfering with those practices or beliefs.  For

---

[1] This brief addresses only the Church-State issues raised by the Complaint.  For that reason it does not address the Administrative Procedure Act allegations.  However, the plaintiffs' allegations as to the rule-making process support the famous saying of Otto Von Bismarck: "Laws are like sausages. It's better not to see them being made."

[2] See McConnell, "The Origins and Historical Understanding of Free Exercise of Religion," 103 Harv. L. Rev. 1409 (1990).

example, in <u>Cantwell v. Connecticut</u>, 310 U.S. 296 (1940), members of the Jehovah Witnesses whose faith required them to reach out and distribute religious materials--even in hostile neighborhoods-- were protected under the First Amendment from prosecution for inciting a breach of the peace.  Similarly, in <u>Torcaso v. Watkins</u>, 367 U.S. 488 (1961), an atheist's rights to non-belief were protected under the Free Exercise Clause against a statute compelling him to take an oath using the name of God.

One reason for these apparent disparities in treatment is that there are analytical difficulties in applying the concepts and values expressed in the religion clauses.[3]  There are often conflicting interests between parties where one of them seeks the protection of the First Amendment.   There are also widely differing views as to whether the First Amendment permits the State to endorse or favor religion.  Finally, the fact is that countless laws impact churches, religious bodies and the personal beliefs of citizens in different ways so that determining what is permissible and what is an inappropriate regulation is not always easy.

Faced with the difficulties in application inherent in these provisions of the First Amendment, and the conflicting interests which are often involved, courts considering First Amendment religion claims have almost always begun their decision making with an analysis of the impact of the laws on the parties affected by the law.  They then have weighed the conflicts between the religious values and beliefs affected by the law and the societal interest promoted by the law or regulation in question in order to determine whether the law or regulation should be sustained.

---

[3] <u>See</u> <u>Laycock</u>, "Formal, Substantive and Disaggregated Neutrality Toward Religion," 39 DePaul L. Rev. 993 (1990), and <u>Lupu</u>, "Where Rights Began: The Problem of Burdens on the Free Exercise of Religion," 102 Harv. L. Rev. 933 (1989).

Turning to the present case, the Complaint spells out at length the impact of the Government Mandate[4] on Catholic dioceses and on various schools and other organizations formed by the Church to carry out its mission in society. The Complaint correctly notes that under the Government Mandate, dioceses and other Catholic institutions that act as employers will be required to provide, as part of an insurance plan, coverage for sterilization procedures, birth control medication and devices and, possibly, abortifacients.[5] The use of these medications and procedures for purposes of birth control is contrary to the official teaching of the Church. While the regulations state that they impose the cost on the insurer, the Amici assume that the ultimate cost for these coverages would rest on the diocese or other church institutions – particularly since many of these Plaintiffs are self-insured. Plaintiffs also correctly note that the narrow exemption for religious bodies contained in the Regulations does not cover the Catholic Church and its various colleges, hospitals and other social and public service entities.

Importantly, the Complaint does acknowledge that there are employees of the various Catholic institutions who are not Catholic and who are not bound by the official teachings of the Church. Moreover, while the Complaint does not mention it, as to those employees who are Catholic, the Court can take judicial notice of the fact that polling data shows that the

---

[4] The actual term used in the Regulation is "Women's Preventive Services: Required Health Plan Guidelines." The term "Government Mandate" has been used by able counsel to capture the compulsory nature of these regulations. For purposes of this brief, Amici adopt the same term so as to state Plaintiffs' case as strongly as possible.

[5] There is some dispute as to whether all of the medications specified in the Complaint prevent a fertilized egg from attaching to a uterus, or simply, inhibit fertilization. (See. N.Y. Times, June 5, 2012 "Abortion Qualms on Morning After Pill May be Unfounded" available at http://www.nytimes.com/2012/06/06/health/research/morning-after-pills-don't-work-science suggests. Again, for purposes of this brief, Amici will accept the assertion that the medication prevents the fertilized egg from developing.

overwhelming majority of Catholics disagree with the official teachings of the Church and believe, as a matter of individual conscience, that they may practice birth control.[6]

Based on the fact that the Government Mandate requires the Plaintiffs to provide coverage that is contrary to the official teaching of the Catholic Church, the Plaintiffs assert that the regulatory Mandate violates their rights under the First Amendment. They seek to have the Mandate declared to be unconstitutional and to have the government defendants enjoined from enforcing it.

It is the position of the parties filing this Amicus Brief -- that to the contrary -- the Government Mandate is constitutional.  First, the Mandate is a neutral regulation aimed at all employers and simply sets minimum standards of health care coverage all employers are obligated to provide for their employees. It is settled law that laws or regulations, which do not treat church-related employers differently than all other employers, are presumptively constitutional.

> "In addressing the constitutional protection of free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening particular religious practice."

Church of Lukumi Babvalu Aye v. City of Hialeah, 508 U.S. 520, 531 (1993).  The Court in Lukumi was simply repeating the rule announced three years earlier in Employment Division, Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990).  More recently, the Supreme Court in Christian Legal Society Chapter of the University of Calif. v. Martinez, 561

---

[6] See Gallup Poll, May 22, 2012, available at http://www.gallup.com/poll/154799/Americans-Including-Catholics-Say-Birth-Control-Moral.

U.S. ____, 130 S.Ct. 2971 (2010), sustained the constitutionality of a regulation by a state law school, Hastings College of Law, that required that any student organization seeking to be granted the financial and other benefits of being a "Registered Student Organization" to have a policy of open membership for all students. The Christian Legal Society at the Law School had a membership policy that required its members to sign a Statement of Faith that they accept the religious teaching that sexual activity is to be confined to marriage between a man and a woman. Accordingly, the Society would not admit homosexuals to membership. The School denied a request from the Society for an exemption from the rule based on their religious views. Because the rule was a reasonable viewpoint neutral policy, the Court sustained the school's policy against a free exercise and a free speech attack by the Christian Legal Society.

The Mandate is not invalid, as suggested by the Plaintiffs, based upon the fact that the government could have created an exception broadly exempting all religiously-affiliated entities from the Mandate, but chose not do so. Nor is the Mandate invalid because of the fact that a few employers may have an exemption which the Plaintiffs don't enjoy. The issues of whether to create exemptions and the breadth of any exemptions are for the political process. See Oregon, supra, 494 U.S. at 890. The Constitution does not compel the creation of the exemptions sought by the Plaintiffs.

Sound policy reasons support the decision of the Secretary not to create a broad exemption that allows all religiously affiliated employers to deny coverage for procedures or treatments that may be contrary to their denomination's teachings. First, if the regulators create an exemption allowing religious groups to refuse to provide coverage for its employees when that coverage is provided by all other employers, they are by law enabling the employer to use economic coercion to impose its teachings on its employees whether or not they are members of

that church and notwithstanding the personal moral beliefs of each individual employee. Second, certain of the contraceptives that the Plaintiffs seek to exclude from their health insurance have medical benefits unrelated to birth control. Examples are the birth control pill (which can be used to regulate menstrual cycles) or condoms (which can prevent the spread of AIDs or other diseases). Third, some denominations object to all medical treatment or to the provision of particular treatments and procedures. Allowing them to opt out of coverage in whole or in part undercuts the goal of providing a consistent, minimum level of care to all covered employees.

Accordingly, the Amici suggest that any thoughtful balancing of all the interests at issue in this case leads to the conclusion that the Mandate is constitutional. The burden on the Church -- although real -- is slight. The Plaintiffs have the relatively modest cost, which all employers have, of implementing the Mandate -- a rule of neutral application imposed on all employers.[7] Their employees are completely free to exercise their own individual consciences and to decide whether they wish to avail themselves of the procedures and devices without economic compulsion on them. Most importantly, *nothing* impairs the absolute right of the Plaintiffs and all other Catholic officials to loudly and clearly state their teachings.

---

[7] Churches and Church-affiliated entities are subject to numerous legal burdens when they are employers that are not limited to health and safety laws. They also have the financial burden, for example, of collecting and remitting state and local taxes withheld from their employees even though these taxes pay for wars or for the death penalty, both of which have been condemned by the Church hierarchy. The cases uniformly hold that these religious objections give no church or person the right to refuse to pay or remit taxes. Civil society can't function if such conduct were permitted. The Government Mandate imposes no more of a legal burden than does the obligation to collect, account for and remit taxes.

### III. The Government Mandate Does Not Violate the Religious Freedom Restoration Act.

The Government Mandate is fully consistent with the Religious Freedom Restoration Act, which was adopted in response to the criticisms of the decision in Employment Division of Oregon v. Smith, supra, that the Court's decision did not give sufficient protection to an individual's right to practice her or his religion. The Act was expressly designed to protect individuals from government intrusion upon the exercise of their religious beliefs. See 42 U.S.C. §2000BB:

> "The purposes of this chapter are: . . . (b) to provide a claim or defense to persons whose religious exercise is substantially burdened by government."

and 42 U.S.C. §2000BB-1(a):

> "Government shall not burden a person's exercise of religion even if the burden results from a rule of general applicability except . . .".

Clearly, the Government Mandate does not impose any requirement on any individual person's exercise of her or his religious beliefs. It simply provides that an employer make available insurance coverage for employees for women's preventive services along with other covered services. Nothing in the Mandate compels any individual to seek or obtain any of the services available to her or him. Every person is left totally free to exercise his or her personal moral and religious beliefs as to whether to seek such services.

In Gonzales v. O Centro Espirita Beneficente Unao de Vegetal, 546 U.S. 418 (2006), the Supreme Court specifically noted that:

> "RFRA requires the government to demonstrate that the compelling Interest test is satisfied through application the challenged law '*to the person*' – *the particular claimant whose sincere exercise of religion is being substantially burdened*."

Id. at 430-431 (emphasis supplied). The focus of the Act thus is upon personal religious freedom and not upon institutional or establishment concerns.

Even if we were to consider the argument of the Plaintiffs that it is offensive to them to provide insurance coverages for prescriptions and treatments which are contrary to their religious teachings and beliefs, this does not violate the Religious Freedom Restoration Act. The Plaintiffs are not being forced to choose between receiving a benefit rather than follow their beliefs, nor are they being coerced to personally act contrary to their beliefs. <u>Navajo Nation v. United States Forest Service</u>, 535 F.3d 1058 (9th Cir. 2008), cert. denied, 556 U.S. 1281 (2009)

While the Plaintiffs are decidedly unhappy with the Mandate, there is nothing in the Mandate compelling any person to decide to use or not to use the services available under the Mandate. No individual's exercise of religion is burdened when each person is free to follow her or his individual conscience.

## IV. CONCLUSION

The Amici respectfully request that the Court hold the Government Mandate, which imposes no requirement on any individual, to be constitutional and wholly consistent with the Religious Freedom Restoration Act. Men and women who are employed by the Plaintiffs should be free to make their own decisions as to whether to utilize the services available under the healthcare coverage provided to them under the Mandate.

Respectfully submitted,

/s/ Charles B. Gibbons
Charles B. Gibbons, Esquire
PA ID No. 8284
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219
E-mail: charles.gibbons@bipc.com
Telephone: 412-392-2025
Facsimile: 412.562.1041

/s/ Francis C. Rapp, Jr.
Francis C. Rapp, Jr., Esquire
PA ID No. 36909
E-mail: fcr@fgsmlaw.com
FGSM, P.C.
428 Boulevard of the Allies
Pittsburgh, PA 15219
Telephone: 412-263-6099
Facsimile: 412.263.6101

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2012, I caused the foregoing Amicus Curiae Brief in Support of Defendants' Motion to Dismiss on Behalf of Call to Action Pennsylvania, Catholics for Social Justice, Pittsburgh Area Pax Christi and The Association of Pittsburgh Priests to be served on all parties of record through the Court's electronic filing system, CM/ECF, including:

John D. Goetz, Esquire
Leon F. DeJulius, Esquire
Paul M. Pohl, Esquire
Ira M. Karoll, Esquire
Laura E. Ellsworth, Esquire
Mary Pat Stahler, Esquire
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA  15219

Rita Ferko Joyce, Esquire
Diocese of Pittsburgh
111 Boulevard of the Allies
Pittsburgh, PA  15222

Bradley P. Humphreys, Esquire
U.S. Department of Justice, Civil Division
Federal Programs
20 Massachusetts Ave., N.W., Room 7219
Washington, D.C.  20530

/s/ Francis C. Rapp, Jr.
Francis C. Rapp, Jr., Esquire
PA ID No. 36909