**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MOST REVEREND LAWRENCE<br>T. PERSICO, BISHOP OF THE<br>ROMAN CATHOLIC DIOCESE<br>OF ERIE, as Trustee for the<br>Roman Catholic Diocese of Erie,<br>A Charitable Trust, *et al.*<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN SEBELIUS, in her<br>official capacity as Secretary of the<br>U.S. Department of Health and<br>Human Services, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:12-cv-123-SJM |

**<u>MEMORANDUM OPINION</u>**

McLAUGHLIN, SEAN J., District J.,

Following the enactment of the Affordable Care Act (or "ACA") in March of 2010, group health plans and health insurance issuers not otherwise grandfathered under the Act are required to provide coverage for certain preventive health services – including FDA approved "contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" -- without cost sharing. Plaintiffs in this lawsuit -- the Roman Catholic Diocese of Erie (the "Diocese"), the Most Reverend Lawrence T. Persico (as Bishop and Trustee of the Diocese), the St. Martin Center, Inc., and the Prince of Peace Center, Inc. – have sought to invalidate and enjoin this regulation (hereinafter referred to as the "Mandate") on the grounds that it violates the Plaintiffs' rights under the First Amendment, the Religious Freedom and Restoration

1

Act, and the Administrative Procedures Act.  Named as Defendants are the Secretaries

of the U.S. Departments of Health and Human Services, Labor, and Treasury as well as

the Departments themselves.  This Court has jurisdiction over the matter pursuant to 28

U.S.C. §§ 1331, 1343(a)(4), and 1346(a)(2).

Presently pending before the Court is the Defendants' motion to dismiss this

action for lack of standing and/or ripeness.  Plaintiffs have filed a memorandum in

opposition to this motion, which is supported by various exhibits.[1]  The matter has been

fully briefed and argued and is ripe for disposition.

## I.    STANDARD OF REVIEW

Defendants' motion to dismiss for lack of jurisdiction, filed pursuant to Rule

12(b)(1) of the Federal Rules of Civil Procedure, concerns the Court's "very power to

hear the case."  *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir.2006) (citation

omitted).  Our Court of Appeals has explained that "there are two types of Rule 12(b)(1)

motions:  those that attack the complaint on its face and those that attack subject matter

jurisdiction as a matter of fact.  When considering a facial attack, 'the Court must

consider the allegations of the complaint as true,' and in that respect such a Rule

12(b)(1) motion is similar to a Rule 12(b)(6) motion."  *Id.*, at 302 n. 3 (citation omitted).

A factual attack, on the other hand,

> differs greatly for here the trial court may proceed as it never could under
> 12(b)(6) or Fed.R.Civ.P. 56.  Because at issue in a factual 12(b)(1) motion
> is the trial court's jurisdiction ... there is substantial authority that the trial
> court is free to weigh the evidence and satisfy itself as to the existence of
> its power to hear the case.  In short, no presumptive truthfulness attaches
> to plaintiff's allegations, and the existence of disputed material facts will

---

[1] In addition, certain interested parties have filed briefs as amicus curiae in this matter.

> not preclude the trial court from evaluating for itself the merits of
> jurisdictional claims. Moreover, the plaintiff will have the burden of proof
> that jurisdiction does in fact exist.

Id. at 302 n.3 (citation omitted) (ellipsis in the original).

Here, the parties are in agreement that the Defendants' jurisdictional challenge

should be treated as a factual challenge, albeit one in which Plaintiffs' factual averments

stand largely unrebutted. Both sides further agree that Plaintiffs bear the burden of

establishing this Court's jurisdiction and, therefore, standing and ripeness. We proceed

accordingly.

## II.    LEGAL BACKGROUND

The provision being challenged in this lawsuit is, as one court has stated, "the

result of a complex history of Congressional legislation and agency rulemaking involving

the Departments of Labor ('DoL'), the Department of the Treasury ('DoT'), and the

Department of Health and Human Services ('HHS') (collectively, the 'Departments')."

*The Roman Catholic Archdiocese of New York v. Sebelius,* --- F. Supp. 2d ---, 2012, WL

6042864 at *1 (E.D.N.Y. Dec. 4, 2012). Because the U.S. District Court for the Eastern

District of New York has aptly summarized the relevant legal history of the so-called

"mandate provision" as it pertains to the issues in this case, we quote liberally from the

Court's decision in *Roman Catholic Archdiocese of New York v. Sebelius*:

> In March 2010, Congress enacted the ACA as well as the Health Care and
> Education Reconciliation Act. These acts established a number of requirements
> relating to "group health plans," a term which encompasses employer plans that
> provide health care coverage to employees, regardless of whether the plans are
> insured or self-insured. *See* 42 U.S.C. § 300gg–91(a)(1); Interim Final Rules for
> Group Health Plans and Health Insurance Issuers Relating to Coverage of
> Preventative Services Under the Patient Protection and Affordable Care Act, 75
> Fed. Reg. 41,726, 41,727 (July 19, 2010) ("Interim Final Rules"). As is relevant
> here, the ACA requires that group health plans provide coverage for a number of

3

preventative medical services at no charge to the patient. § 300gg–13. Specially, the ACA provides that a group health plan must "at a minimum provide coverage for and shall not impose any cost sharing requirements for[,]" among other things, women's "preventative care and screenings ... as provided for in comprehensive guidelines supported by the Health Resources and Services Administration[.]" § 300gg–13(a)(4). FN 2

>FN 2. The Health Resources and Services Administration ("HRSA") is an agency within HHS.

The ACA's preventative services coverage requirement does not, however, apply to group health plans that are grandfathered. See 42 U.S.C. § 18011(a)(2). A group health plan is grandfathered when at least one person was enrolled in the plan on March 23, 2010 and the plan has continually covered at least one individual since that date. See 26 C.F.R. § 54.9815–1251T(a)(1)(i)(DoT); 29 C.F.R. § 2590.715–1251(a)(1)(i)(DoL); 45 C.F.R. § 147.140(a)(1)(i)(HHS). A plan may lose its grandfathered status, however, if, when compared to the terms of the plan as of March 23, 2010, it eliminates benefits, increases a percentage cost-sharing requirement, significantly increases a fixed-amount cost-sharing requirement, significantly decreases an employer's contribution rate, or imposes or lowers an annual limit on the dollar value of benefits. See 26 C.F.R. § 54.9815–1251T(g)(1) (DoT); 29 C.F.R. § 2590.715–1251(g)(1)(DoL); 45 C.F.R. §147.140(g)(1) (HHS).

The Departments began issuing regulations implementing the ACA in phases. On July 19, 2010, they announced that HHS was developing the HRSA guidelines and expected to issue them by August 1, 2011. See Interim Final Rules, 75 Fed. Reg. at 41,728. Since there were no existing HRSA guidelines concerning preventative care and screenings for women at the time of the Interim Final Rules, HHS commissioned the Institute of Medicine ("IOM"), a Congressionally-funded body, with "review[ing] what preventative services are necessary for women's health and well-being" and recommending comprehensive guidelines, as called for by the ACA. On July 19, 2011, IOM published a report recommending the inclusion of certain preventative medical services in HRSA's guidelines. Among other things, IOM recommended that group health plans be required to cover "the full range of Food and Drug Administration ["FDA"]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." FDA-approved contraceptive methods encompass oral conceptive pills, diaphragms, intrauterine devices, and emergency contraceptives, which, according to plaintiffs, can cause abortions.

HRSA adopted IOM's recommendations on August 1, 2011. Two days later, the Interim Final Rules were amended to "provide HRSA additional discretion to exempt certain religious employers from the [HRSA] Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46,263 (Aug. 3, 2011). See also 45 C.F.R. § 147.130(a)(1)(iv)(A). In order to qualify for the religious employer exemption, an organization must meet all of the following criteria:

 (1) The inculcation of religious values is the purpose of the organization.

(2) The organization primarily employs persons who share the religious ten[e]ts of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.  FN3

> FN 3.  These sections of the Internal Revenue Code apply to "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order."  26 U.S.C. § 6033(a)(1), (a)(3)(A)(i), (a)(3)(A)(iii).

45 C.F.R. § 147.130(a)(1)(iv)(B)(HHS).  See also 29 C.F.R. § 2590.715–2713(a)(1)(iv)(DoL).  HRSA exercised its discretion under the amended Interim Final Rules and exempted the religious employers who satisfy these criteria from the requirement of covering contraceptive services.  See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventative Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012).

The Departments received over 200,000 responses to their request for comments on the amended Interim Final Rules.  Many of the comments were submitted by religiously-affiliated institutions and asserted that the religious employer exemption was too narrow and that the limited scope of the exemption raised religious liberty concerns.  Id. at 8,727.  On February 15, 2012, the Departments finalized the amended Interim Final Rules without making any changes to the criteria used to determine whether an organization qualified for the religious employer exemption.  Id.  These finalized amended rules are the operative regulations at issue in this suit and, together with the HRSA guidelines, constitute the Coverage Mandate.  See 29 C.F.R. § 2590.715–2713(a)(1)(iv)(DoL); 45 C.F.R. § 147.130(a)(1)(iv) (HHS).

At the same time that they finalized the Interim Final Rules, however, the Departments announced a "temporary enforcement safe harbor" period during which they planned "to develop and propose changes to these final regulations that would meet two goals — providing contraceptive coverage without cost-sharing to individuals who want it and accommodating nonexempted, non-profit organizations' religious objections to covering contraceptive services [.]"  77 Fed. Reg. at 8,727.  Without the safe harbor, non-grandfathered plans would be required to comply with the Coverage Mandate for plan years beginning on or after August 1, 2012.  The safe harbor extended this date, by a year, to plan years beginning on or after August 1, 2013, during which time the Departments agreed not to take any enforcement action against an employer or group health plan that complies with the conditions of the safe harbor.  See HHS, Guidance on Temporary Enforcement Safe Harbor, at 3 (Aug. 15, 2012), available at http://cciio.cms .gov/resources/files/prev–services–guidance–08152012.pdf (last visited Dec. 3, 2012).  In order to comply with the

terms of the safe harbor, the organization must (1) be organized and operate as a non-profit entity, (2) have "consistently not provided all or the same subset of contraceptive coverage otherwise required at any point" from February 10, 2012 onward because of the organization's religious beliefs, (3) provide notice to participants that some or all contraceptive services will not be covered for the first plan year beginning on or after August 1, 2012, and (4) provide a certification that it satisfies these criteria.

Consistent with their announced plan "to develop and propose changes" to the Interim Final Rules, on March 21, 2012, the Departments filed an advance notice of proposed rulemaking ("ANPRM") in the Federal Register concerning possible means of accommodating religious organizations' objections to the Coverage Mandate.  See Certain Preventative Services under the Affordable Care Act, 77 Fed. Reg. 16,501 (Mar. 21, 2012).  Specifically, the ANPRM "presents questions and ideas" and provides an "opportunity for any interested stakeholders to provide advice and input into the policy development relating to the accommodation to be made with respect to non-exempted, non-profit religious organizations with religious objections to contraceptive coverage."  Id. at 16,503.  One possible accommodation that the Departments "intend to propose" is to require health insurance issuers to provide health insurance coverage that excludes contraceptive services to objecting religious organizations while, at the same time, offering contraceptive coverage directly to plan participants without charging either the participants or the organization.  Id. at 16,505.

Roman Catholic Diocese of New York v. Sebelius, 2012 WL 6042864 at *1-3.

As the foregoing discussion explains, the Departments, in their March 21, 2012 ANPRM, lay out a possible accommodation whereby health insurance companies would be required to offer group health insurance coverage, minus contraceptive coverage, to religious organizations while simultaneously providing contraceptive coverage directly to plan participants and beneficiaries.  See Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. 16501, 16503 (Mar. 21, 2012).  Under this proposed accommodation, the health insurance company would not be permitted to impose any cost-sharing on the part of the plan participants and beneficiaries and would be further precluded from imposing any premium charge to the religious organization relative to this separate contraceptive coverage.  Id.  For religious organizations like the Plaintiffs which are self-insured, the ANPRM states Defendants' intent to propose "that a third-

party administrator of the group health plan or some other independent entity assume

this responsibility."  Id.  According to the ANPRM, the Defendants "suggest multiple

options for how contraceptive coverage in this circumstance could be arranged and

financed in recognition of the variation in how such self-insured plans are structured and

different religious organizations' perspectives on what constitutes objectionable

cooperation with the provision of contraceptive coverage."  Id.


### III.   FACTUAL AND PROCEDURAL BACKGROUND[2]


A. The Parties

   1. *Plaintiffs Persico and the Diocese*

Plaintiff, the Most Reverend Lawrence T. Persico, is Bishop and Trustee of

Plaintiff the Roman Catholic Diocese of Erie (the "Diocese").  (Complaint ¶ 2.)[3]  The

Diocese is a nonprofit Pennsylvania Charitable Trust with a principal place of

administration in Erie, Pennsylvania.  (Id. at ¶ 28.)  It is organized exclusively for

charitable, religious, and educational purposes within the meaning of Section 501(c)(3)

of the Internal Revenue Code.  (Id.)  The Diocese consists of 117 parishes serving a

thirteen-county region, including approximately 222,000 individuals of Catholic faith.  (Id.

at ¶ 42.)

---

[2] The following facts are taken from either the Plaintiff's complaint or their exhibits in support of their memorandum opposing the pending motion.  In either event, the following averments stand unrebutted on this record.

[3] The Complaint originally named as Plaintiff the Most Reverend Donald W. Trautman, proceeding in his capacity as Bishop and Trustee of the Diocese.  On October 9, 2012, the caption was amended to reflect the substitution of Lawrence T. Persico in place of Donald W. Trautman, following Bishop Trautman's retirement.  (See Order of 10/9/12 [ECF No. 39].)

The Diocese serves both Catholic and non-Catholic residents of Northwestern Pennsylvania in three main ways:  by educating children within the Diocese's school system, by promoting spiritual growth, and by service to the community.  (Complaint ¶¶ 2, 6, 40.)  The Diocese carries out this work both on its own and through its support of the Catholic Charities of the Diocese of Erie, whose charitable programs include those operated by Plaintiffs St. Martin Center, Inc. ("SMC") and Prince of Peace Center, Inc. ("PPC").  (Id.)

Through its numerous elementary, middle and secondary schools, the Diocese educates over 7,500 students of all faiths.  It also offers tuition assistance for students based solely on financial need.  (Complaint ¶ 41.)

In addition to serving the spiritual needs of its Catholic residents and educating Catholic and non-Catholic students, the Diocese serves thousands of Northwest Pennsylvanians through its social services arms.  (Complaint ¶ 44.)  For example, many non-Catholics are served by the Diocese's post-abortion ministry, prison ministry, family ministry, disability ministry, international Diocesan missions, various respect life organizations, and the numerous religious and non-religious charities that receive the Diocese's financial support, including the following:  (a) St. Elizabeth Center, which operates a food pantry, thrift store, and clothing shop for lower-income individuals; (b) The Good Samaritan Center, a shelter for homeless men and provider of an emergency one-family apartment and other assistance; (c) Better Homes for Erie, a provider of affordable housing to low-income families; and (d) Catholic Charities Counseling and Adoption Services, a provider of professional counseling, adoption counseling, pregnancy counseling, and refugee resettlement services.  (Id. at ¶ 45.)

These social service programs, through support from the Diocese, provide aid to over 50,000 individuals each year without regard to the individuals' religion, race, or financial condition.  (Id. at ¶ 46.)   The Diocese would not be able to provide all of the foregoing social services without the financial contributions of its donors and the work of its numerous volunteers.  (Id. at ¶ 48.)

The Diocese employs approximately 70 full-time equivalent employees.  (Affidavit of David J. Murphy [24-3], Ex. 2 to Pls.' Mem. In Opp. to Defs.' Mot. to Dismiss, at p. 3, ¶ 5.)  However, the Diocese does not know how many of its employees are Catholic. (Complaint ¶ 49.)  The Diocese educates and assists tens of thousands of individuals but it is unknown how many of those educated or served by the Diocese are Catholic.  It is therefore unclear to the Diocese whether it would qualify for the exemption from the challenged mandate afforded to "religious employers."  (Id.)

The Diocese operates a self-insured health plan.[4]  (Complaint ¶ 52.)  Diocesan health plans are administered by Third Party Administrators ("TPAs"), which are paid a flat administrative fee for each individual covered by the plan.  (Id. at ¶ 53.)  The TPAs do not pay for any services received by the Diocese's covered employees.  (Id.)

Through its health plan, the Diocese provides health insurance coverage to approximately 803 employees, including those employed directly by the Diocese as well as those employed by the various parishes, schools, and charitable agencies of the Diocese.  The Diocese also covers the dependents of these employees, resulting in a total of approximately 994 insured individuals.  (Murphy Affid. at ¶ 5.)

---

[4] As a self-insurer, the Diocese does not contract with a separate insurance company for the provision of health care coverage; instead, the Diocese itself functions as the insurance company by underwriting the medical costs of its employees and the employees of its affiliated corporations.  (Complaint ¶ 52.)

The Diocesan health care plan does not meet the ACA's definition of a "grandfathered" plan.  Accordingly, the Diocese did not include a statement describing its grandfathered status in plan materials, as required by 26 C.F.R. § 54.9815-1251T(a)(2)(ii) .[5]  (Complaint ¶ 54.)  Under the Diocesan health plan, each new plan year commences annually on July 1.  (Id. at ¶ 55.)

### 2.  *Plaintiff The Saint Martin Center, Inc.*

Plaintiff SMC is a nonprofit 501(c)(3) affiliate corporation of Catholic Charities with its principal place of business in Erie, Pennsylvania.  (Complaint ¶ 29.)  SMC provides needy individuals and families, regardless of their religious affiliation, with resources necessary for them to gain self-sufficiency.  (Id. at ¶ 56.)

SMC serves underprivileged individuals within the greater Erie community by providing social services, including an in-house pantry, vouchers for clothing items, assistance for rent, mortgage, and utility payments, financial assistance for life-

---

[5] Defendants initially disputed the Plaintiffs' averment that its health care plan does not qualify for "grandfathering," on the grounds that the only information asserted in the complaint concerning the plan's non-grandfathered status was the Plaintiffs' averment that the Diocese had not included a statement of grandfathered status in its plan materials.  Defendants argued that Plaintiffs should not benefit from a self-inflicted injury simply by having failed to provide notice in its plan materials of the plan's otherwise "grandfathered" status.  Without more information justifying the conclusion that the Diocese's health care plan cannot benefit from "grandfathered" status, Defendants argued, the claims premised upon the plan(s) should be dismissed due to the Diocese's lack of standing.

However, in their brief opposing the pending motion to dismiss and supporting materials, the Plaintiffs explain that the Diocese's health care plan cannot be considered "grandfathered" because the Diocese changed insurers between March 23 and November 15, 2010.  Specifically, the Diocese represents that its health care plan went from being self-insured to fully insured on July 1, 2010 before switching back to self-insured status on July 1, 2011.  (See Affidavit of David J. Murphy, Ex. 2 [ECF No. 24-3] to Pls.' Mem. In Opp. to Mot. to Dismiss at p. 3, ¶ 7.)  According to the pertinent administrative rules, a group health plan (including one that was self-insured as of March 23, 2010) ceases to be grandfathered if the plan or its sponsor entered into a new policy, certificate, or contract of insurance after March 23, 2010 with an effective date prior to November 15, 2010.  45 C.F.R. § 147.140(a)(1)(ii) (2013).

Following this representation, Defendants have not pursued their challenge concerning the non-grandfathered status of the Diocese's health care plan.  Accordingly, we will assume for present purposes that the Diocese's health care plan is, indeed, ineligible for grandfathered status.

sustaining medical prescriptions, vouchers for bus passes and gasoline, guidance for

creating a budget, and hot breakfast meals.  SMC also provides various housing-related

services such as counseling for potential homebuyers, fair housing and predatory

lending education, lead paint detection, foreclosure prevention counseling, and financial

assistance with respect to building code compliance.  In addition, SMC operates an

early learning center, provides workforce kitchen skills to individuals in need of work,

and provides clothing to male individuals attending job interviews and/or reentering the

workforce.  (Complaint ¶ 56.)  SMC relies on financial contributions from its donors and

on the work of numerous volunteers, without which it would be unable to provide the

foregoing services.  (Id. at ¶ 58.)

SMC has over 50 full-time employees but does not know how many of its

employees are Catholic.  Similarly, SMC does not know how many of its beneficiaries

are Catholic.  (Complaint ¶¶ 59, 61.)

SMC's employees are insured through the Diocese's health plan.  (Murphy Affid.

at ¶ 4; Complaint ¶ 60.)

### 3.  *Plaintiff Prince of Peace Center, Inc.*

Plaintiff Prince of Peace Center, Inc. ("PPC") is a nonprofit 501(c)(3) affiliate

corporation of Catholic Charities with its principal place of business in Farrell,

Pennsylvania.  (Complaint ¶ 30.)  PPC provides various social and self-sufficiency

services to the needy in the greater Mercer County community.  (Id. at ¶ 62.)

Among the ways in which PPC serves those in need are through its family

support services, which include PPC's HOPE (Help and Opportunity for Personal

Empowerment) Advocacy Program as well as its Project RUTH (Resources,

Understanding, Training, and Homes).  (Complaint ¶ 62(a).)  HOPE Advocacy provides longer term support for individuals and families struggling with poverty, while Project RUTH is a transitional housing program for homeless single parent families.  All of the individuals served by HOPE Advocacy and Project RUTH are given the opportunity to learn basic life skills necessary for self-sufficiency and family stability through intensive case management and monthly support groups.  (Id.)

PPC also operates emergency assistance programs which provide food, clothing, furniture, and appliances, among other things, at little or no cost to those in need. Through these programs, which are privately funded, PPC is able to offer over $50,000 in assistance every year to help pay utility bills and offer other support with the goal of keeping family units together.  PPC's AWESOME (Assistance With Education, Shelter, Organization, Money management, and Employment) program assists single men and women with children who desire to attain self-sufficiency.  (Complaint ¶ 62(b).)

In addition to the foregoing, PPC runs a mission thrift store, which provides items such as clothing and furniture at low cost.  (Complaint ¶ 62(c).)  It operates PA WORKWEAR, a program which provides the needy with clothing, accessories, and training to prepare for job interviews. (Id at ¶ 62(d).)  It operates a soup kitchen, which serves approximately 5,700 individuals each year, and distributes supplemental groceries to approximately 700 individuals annually.   (Id. at ¶ 62(e).)  PPC also runs computer classes and makes refurbished computers available to its students and holds various programs and charity drives for underprivileged children in the Mercer County area.  (Id. at ¶ 62(f)-(g).)

PPC does not inquire into the religious beliefs of the individuals it serves.  Its mission is to strengthen families, build communities, and reduce poverty among people of all ages, faiths, races and backgrounds.  (Complaint ¶ 63.)  Without the financial contributions of its donors and the work of many volunteers, PPC would not be able to provide the foregoing services.  (Id. at ¶ 65.)

Like SMC, PPC's employees are insured through the Diocese's health care plan. (Murphy Affid. at 4; Complaint ¶ 66.)  PPC does not know how many of its employees are Catholic.  (Id. at ¶¶ 67-68.)

B. The Plaintiffs' Religious Beliefs

Plaintiffs' work is guided by and consistent with the teaching of the Catholic Church, of which Plaintiffs are a constituent part.  Among the core teachings of the Catholic Church is the tenet that life begins at conception and continues through natural death.  Catholic doctrine therefore regards abortion, sterilization, and contraception as gravely contrary to moral law.  (Complaint ¶ 4.)

Catholic faith also teaches that devotion to God is demonstrated through devotion to all people regardless of their faith or financial condition.  Catholic social teaching requires Catholic individuals and organizations to work to create a more just community by striving to meet needs wherever they arise.  (Complaint ¶ 5.)

Through the educational and social services outlined above, Plaintiffs serve all people, regardless of the individual's faith or financial condition.  (Id. at ¶¶ 7, 69.) Plaintiffs' commitments to teach and to serve all are part of a larger belief system that

likewise proclaims Catholic teachings on the sanctity of human life and dignity of all persons.  (Id. at ¶ 70.)

C. <u>Plaintiff's Complaint</u>

This action was commenced on May 21, 2012 with the filing of Plaintiffs' complaint.  In it, Plaintiffs aver that the ACA's mandate forces them to take action subsidizing, providing, and/or facilitating coverage for abortifacients, sterilization services, contraceptives, and related counseling services in violation of their religious beliefs.  (Complaint ¶ 21.)

While the ACA and accompanying regulations have exempted "religious employers" from the Mandate, Plaintiffs contend that the Diocese does not know whether it satisfies the ACA's definition of "religious employer."  (Complaint ¶ 12.)  In order to make this determination, Plaintiffs claim, the Diocese will have to submit to "an intrusive governmental investigation into whether, in the view of the Department of [HHS], its 'purpose' is the 'inculcation of religious values,' whether it 'primarily' employs Catholics, and whether it 'primarily' serves Catholics."  (Id. at ¶ 12.)  In any event, however, Plaintiffs SMC and PPC cannot meet the definition of "religious employers," as they employ and serve people of all faiths.  (Id. at ¶ 14.)

Plaintiffs contend that, to even attempt to qualify as "religious employers," they may be required to stop serving and employing non-Catholics – actions which, in Plaintiffs' view, would betray their religious commitment to serving all in need without regard to religion.  (Complaint ¶ 14.)  Thus, Plaintiffs claim, the Government is imposing upon them an untenable moral dilemma whereby they must "choose between respecting the sanctity of all human life, on the one hand, and fulfilling their religious

mission to provide opportunities and charitable support to all people regardless of their faith, on the other." (Complaint ¶ 8.) Either way, it is alleged, Plaintiffs will be forced to violate their sincerely held religious beliefs. (Id. at ¶ 16.)

Plaintiffs state that their only other choice it to violate the law, either by refusing to provide the mandated services or dropping their health plans. (Complaint at ¶ 15.) This, it is claimed, might well subject Plaintiffs to substantial fines and penalties, which in turn would hamper their ability to provide important services to their communities and erode the funds they use to carry out their educational and charitable missions. (Id.)

Moreover, Plaintiffs contend that they are presently suffering uncertainty as to their rights and duties in planning, negotiating, and implementing their group health insurance plans, their hiring and retention programs, and their social, educational, and charitable programs and ministries. (Complaint ¶ 26.) They maintain that an adjudication determining the validity of the Mandate is necessary in order to resolve this uncertainty. (Id.)

Plaintiffs' complaint sets forth nine causes of action. Count 1 asserts that the Mandate violates Plaintiffs' rights under the Religious Freedom Restoration Act inasmuch as it (i) imposes a substantial burden Plaintiffs' exercise of religion (ii) without the justification of a compelling governmental interest and (iii) by means which are not the least restrictive means of furthering the alleged governmental interest. Counts 2 through 4 assert various violations of the Plaintiffs' First Amendment rights premised upon the allegation that the Mandate substantially burdens the Plaintiffs' free exercise of religion, discriminates against their religious viewpoint, infringes upon their free speech rights, and creates excessive governmental entanglement with their religious practices.

15

Count 5 asserts First Amendment violations premised upon the Government's alleged interference with matters of internal church governance.  Count 6 asserts that the Mandate requires Plaintiffs to subsidize, provide, and/or facilitate education and counseling for certain services they find objectionable and, thereby, compels speech which violates Plaintiffs' religious beliefs, in violation of the First Amendment.  Count 7 alleges violations of the APA premised upon the Defendants' failure to conduct notice-and-comment rulemaking as well as Defendants' improper delegation of rulemaking to the IOM.  Count 8 alleges arbitrary and capricious conduct on the part of the Defendants in violation of the APA.  Count 9 asserts a claim for failing to act "in accordance with law" in violation of the APA.  Among other things, Plaintiffs seek an order enjoining enforcement of the Mandate, vacating the Mandate, and declaring that the Mandate violates Plaintiffs' rights under RFRA, the First Amendment, and the APA.

   D. <u>Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1)</u>

        On August 6, 2012, Defendants filed the pending motion to dismiss the complaint for lack of subject matter jurisdiction.  In it, Defendants contend that Plaintiffs lack standing to assert their claims and, in addition, they claim the case is not ripe for adjudication.

        Defendants' motion is premised on the Government's actions, following enactment of the ACA, which Defendants say are designed to ameliorate the Plaintiffs' religious concerns relative to the Mandate.  In particular, Defendants point to:  (a) the amendment to the preventative services coverage regulations which exempts certain "religious employers" from the Mandate; (b) the issuance of guidance relative to the so-

called "safe harbor" provision, which is applicable to a larger group of "religious organizations" having theological objections to the Mandate, and which precludes enforcement of the Mandate as to such organizations until the first plan year beginning on or after August 1, 2013; and (c) the publication of an advance notice of proposed rulemaking ("ANPRM") in the Federal Register expressing the Government's intent to further amend the regulations in a manner that will accommodate non-exempt, non-grandfathered religious organizations' objections to the Mandate.

Defendants contend that these measures deprive Plaintiffs of standing because, in light of them, Plaintiffs cannot demonstrate any imminent injury stemming from the Mandate.  According to Defendants, the safe harbor provision protects the Plaintiffs against any enforcement of the Mandate until at least July 1, 2014.  Moreover, Defendants say, the absence of any imminent harm is further demonstrated by the Government's initiation of further rulemaking which promises to amend the Mandate, well before July of 2014, so as to accommodate Plaintiffs' religious objections.  For basically the same reasons, Defendants insist that Plaintiffs' various claims are not ripe for adjudication inasmuch as there is no present adversity of interest between the parties and a declaratory judgment would provide neither "conclusivity" relative to the parties' legal relationship nor practical utility.

Plaintiffs have filed a memorandum in opposition to the pending motion in which they attempt to outline various injuries they are presently incurring as a result of the Mandate.  The Plaintiffs' memorandum is supported by the affidavits of Mary Maxwell and David J. Murphy, which are, in turn, accompanied by various exhibits.  For Rule 12(b)(1) purposes, these evidentiary submissions stand unrebutted and will be

construed as true and accurate insofar as they assert factual information rather than conclusions of law.

With this background in mind, we turn to our legal analysis, addressing first the issue of ripeness.

## IV.    DISCUSSION

### A.    Ripeness

"The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 808 (2003) (citation omitted). The doctrine "serves to 'determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'" *Khodara Environmental, Inc. v. Blakey,* 376 F.3d 187, 196 (3d Cir. 2004) (citation omitted). The ripeness requirement is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effect felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-49 (1967). "Various considerations underpin the ripeness doctrine, including ... whether the facts of the case are sufficiently developed to provide the court with enough information on which to decide the matter conclusively, and whether a party is genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one." *Khodara, supra,* at 196 (internal quotation marks and citation omitted).

Ascertaining whether an administrative action is ripe for judicial review requires courts to evaluate "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration."  *National Park Hospitality Ass'n,* 538 U.S. at 808 (citing *Abbott Laboratories, supra,* at 149).  In the context of a declaratory judgment action, our circuit applies a "refined" test for determining ripeness by considering:  "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment."  *Khodara,* 376 F.3d at 196 (citations omitted).

Plaintiffs contend, however, that we should apply a "relaxed ripeness" standard in this case rather than the foregoing three-step analysis.  Citing *Peachlum v. City of York, Pennsylvania,* 333 F.3d 429 (3d Cir. 2003), Plaintiffs point out that "[a] First Amendment claim, particularly a facial challenge, is subject to a relaxed ripeness standard."  Id. at 434.  That is to say,

> courts have repeatedly shown solicitude for First Amendment claims because of concern that, even in the absence of a fully concrete dispute, unconstitutional statutes or ordinances tend to chill protected expression among those who forbear speaking because of the law's very existence. This concern is particularly acute with regard to facial challenges to a statute or ordinance.

Id. at 434-35 (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 612 (1973)).

The relaxed ripeness standard in the context of a pre-enforcement challenge thus "stems from a concern that a person will merely comply with an illegitimate statute rather than be subjected to prosecution."  Id. at 435 (citation omitted).  Alternatively, "the government may choose never to put the law to the test by initiating a prosecution, while the presence of the statute on the books nonetheless chills constitutionally

protected conduct."  Id. (citing 13A *Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,* FEDERAL PRACTICE AND PROCEDURE § 3532.5 (2d ed. 1984)).

While we acknowledge the application of a relaxed ripeness standard in appropriate cases, we do not agree with Plaintiffs that such a relaxed standard applies here.  First, while the Plaintiffs' RFRA and First Amendment claims do concern fundamental rights, it is not clear that these claims actually present facial, as opposed to "as applied," challenges to the ACA.[6]  In the First Amendment context, a law may be facially challenged on the basis of being impermissibly overbroad where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 449 n.6 (2008).  Because "[t]he concept of 'substantial overbreadth' is not readily reduced to an exact definition," *Free Speech Coalition, Inc. v. Attorney General of U.S.,* 677 F.3d 519, 537 (3d Cir. 2012 )(citing *Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 800 (1984)), courts typically must consider factors such as:  "(1) the number of valid applications" of the statute; (2) the historic or likely frequency of conceivably impermissible applications; (3) the nature of the activity or conduct sought to be regulated; and (4) the nature of the state interest underlying the regulation."  *Id.* at 537-38 (internal quotation marks omitted; citation omitted).  Plaintiffs have not framed their claims in a manner that suggests they are asserting a facial challenge to the Mandate on overbreadth grounds, as opposed to simply asserting a direct infringement of their own personal First Amendment rights.

---

[6] We note that Plaintiffs' APA claims do not allege the violation of any fundamental right and, therefore, do not benefit from the relaxed ripeness standard in any event.

Second, the concerns which underpin the relaxed ripeness standard are not present here.  As *Peachlum* makes clear, it is the risk of otherwise constitutional speech being chilled which justifies relaxing the ripeness standard in First Amendment cases presenting facial-challenges to an allegedly overbroad regulation.  In such cases, "even the remotest threat of prosecution, *such as the absence of a promise not to prosecute*, has supported a holding of ripeness where the issues in the case were 'predominantly legal' and did not require additional factual development."  Id., 333 F.3d at 435 (emphasis supplied).  Here, as we explain in more detail below, there is effectively a promise in place by the Defendants not to prosecute the Mandate in its current form; thus, no fundamental rights of any party are being affected or will be affected under the Mandate as it currently stands.[7]  Nor, to put a finer point on it, is there any allegation by Plaintiffs that their own protected speech, or anyone else's, is being chilled; rather they complain that the Mandate in its current form *compels* them to engage in speech which they find objectionable but in which they have not yet actually engaged.

---

[7] For this reason, assuming a relaxed ripeness standard were to be applied here, Plaintiffs cannot establish "even the remotest threat of prosecution" in light of the Defendants' promise not to prosecute them.  *See Zubik v. Sebelius*,--- F. Supp. 2d ---, 2012 WL 5932977 at *7 n.13 (W.D. Pa. Nov.. 27, 2012) (finding that, even under relaxed ripeness standard, Plaintiffs' claims would not be justiciable, in part because "it is not disputed that Defendants have provided a promise not to enforce" the Mandate); *Nebraska ex rel. Bruning v. U.S. Dept. of Health and Human Services,* --- F. Supp. 2d ---, 2012 WL 2913402 at *23 (D. Neb. July 17, 2012) ("[P]laintiffs in this case do not face a direct and immediate dilemma that involves the sacrifice of their First Amendment rights, and the defendants' position on the scope of the exemptions to the contraceptive coverage requirements is tentative – and under these circumstances, the plaintiffs cannot establish ripeness even under a relaxed standard.") (footnote omitted).  *See also Tait v. City of Philadelphia,* 410 Fed. Appx. 506, 509 (3d Cir. 2011) (First Amendment challenge to city ordinance, which regulated the work of tour guides and required them to obtain certificates before leading tours in certain historic areas of Philadelphia, was not ripe under relaxed standard where there was no evidence that the speech of any tour guide had been chilled and where the City had expressly "disavowed" enforcement of the Ordinance until some indeterminate point in the future when an announcement would be made that a written test would be administered).

Finally, this case does not present the type of situation, referenced in *Peachlum,* where "the issues in the case [a]re 'predominantly legal' and d[o] not require additional factual development."  33 F.3d at 435.  Despite the fact that Plaintiffs' evidentiary record is essentially unchallenged, "further factual development is required to know whether, when, and how the [amended form of the Mandate] will, in fact, apply to Plaintiffs."  *Most Reverend David A. Zubik v. Sebelius,* 2012 WL 5932977 at * 7 n.13 (W.D. Pa. Nov. 27, 2013).  In light of these distinguishing facts, we find that the relaxed ripeness standard does not apply.

Having identified the appropriate ripeness standard, we turn to an analysis of the relevant factors.  In addressing these issues, however, we acknowledge that this Court is not writing on a blank slate.  As of this writing, no less than ten district courts have entertained ripeness inquiries in the context of legal claims very similar to those raised here.  Notably, all but one of the courts have found the plaintiffs' claims to be unripe. *See Colorado Christian University v. Sebelius,* Civil Action No. 11-cv-3350-CMA-BNB, 2013 WL 93188 (D. Colo. Jan. 7, 2013) (Christian university's challenges to the ACA's preventative services mandate on First Amendment and other grounds was not ripe); *Catholic Diocese of Peoria v. Sebelius,* No. 12-1276, 2013 WL 74240 (C.D. Ill. Jan. 4, 2013) (claims of Catholic Diocese held unripe); *University of Notre Dame v. Sebelius,* Case No. 3:12-CV-253-RLM, 2012 WL 6756332 (N.D. Ind. Dec. 31, 2012) (claims of Catholic University found to be unripe); *The Catholic Diocese of Biloxi, Inc. v. Sebelius,* Civil No. 1:12CV158-HSO-RHW (S.D. Miss. Dec. 20, 2012) (claims held unripe); *Zubik v. Sebelius, supra*, 2012 WL 5932977 (same); *Catholic Diocese of Nashville v. Sebelius,* No. 3-12-0934, 2012 WL 5879796 (M.D. Tenn. Nov. 21, 2012) (same);

*Wheaton College v. Sebelius,* --- F. Supp. 2d ---, 2012 WL 3637162 (D.D.C. Aug. 24, 2012) (same), *appeal held in abeyance,* 2012 WL 6652505 (D.C. Cir. Dec. 18, 2012); *Belmont Abbey College v. Sebelius,* --- F. Supp. 2d ---, 2012 WL 2914417 (D.D.C. July 18, 2012) (same), *appeal held in abeyance sub nom Wheaton College v. Sebelius,* 2012 WL 6652505 (D.C. Cir. Dec. 18, 2012); *Nebraska ex rel. Bruning v. U.S. Dept. of Health and Human Services,* --- F. Supp. 2d ---, 2012 WL 2913402 at *20-24 (D. Neb., July 17, 2012) (same).[8] *But see Roman Catholic Archdiocese of New York v. Sebelius, supra,* 2012 WL 6042864 at *20-24 (finding that plaintiffs' challenge to ACA's preventative services mandate was fit for review).

Having carefully reviewed the foregoing authority, this Court finds itself to be in agreement with the majority of district courts which have dismissed lawsuits virtually identical to this one for lack of ripeness. We explain this conclusion more fully in our analysis of the relevant factors which follow.

### 1. Adversity of Interest

As an initial matter, we find no adversity of legal interests between the parties for purposes of the first ripeness prong. "Although the [plaintiff] need not have suffered a 'completed harm' to establish adversity of interest, … it is necessary that there be a substantial threat of real harm and that the threat 'must remain real and immediate throughout the course of the litigation.'" *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1463 (3d Cir. 1994) (internal quotation marks and citation omitted). "Where the plaintiff's action is based on a contingency, it is

---

[8] Another federal district court has dismissed a similar lawsuit by a non-profit religious organization for lack of standing. *See Legatus v. Sebelius,* --- F. Supp. 2d ---, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012).

unlikely that the parties' interest will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III." *Armstrong World Indus. v. Adams*, 961 F.2d 405, 411–12 (3d Cir.1992).

In this case, all of the Plaintiffs' claims are premised upon the assumption that they will be imminently required to comply with the Mandate, a situation which, Plaintiffs say, places them in an impossible trilemma by forcing them to either:  (a) subsidize, provide and/or facilitate the coverage of abortifacients, sterilization services, contraceptives, and related counseling services, in which case they will be violating sincerely held religious beliefs; (b) attempt to obtain exemption from the Mandate as "religious employers," in which case they will be violating different, but no less sincerely held religious beliefs by abandoning service to non-Catholics; or (c) violate the terms of the Mandate, in which case they will likely incur substantial fines and penalties.

However, Plaintiffs' assumption that they will be subjected to the Mandate in a manner that violates their sincerely-held religious beliefs is, at most, a contingency which may well never to come to pass.  Under the "safe harbor" provisions established by current regulations, Plaintiffs are protected from any potential enforcement action relative to the Mandate until at least January 1, 2014.  In addition, the Defendants have repeatedly stated their intent to amend the Mandate, well before January 1, 2014, for the express purpose of accommodating the Plaintiffs' religiously motivated objections to the regulation.  Through their issuance of the March 21, 2012 ANPRM, Defendants have in fact already initiated the amendment process.  *See* Certain Preventive Services Under the Affordable Care Act, Administrative Notice of Proposed Rulemaking ("ANPRM"), 77 Fed. Reg. 16501 (Mar. 21, 2012).  Indeed, the Defendants have gone so

far as to plainly state that the Mandate in its current form will never be enforced against the Plaintiffs and that they will publish a Notice of Proposed Rulemaking relative to the Mandate in the first quarter of 2013.[9]

Based on these representations from the Defendants, which we credit as good faith statements of their true intent, we find that adversity of legal interests between the parties is lacking. See *Tait v. City of Philadelphia,* 410 Fed. Appx. 506, 509 (3d Cir. 2011) ("When a government body promises not to enforce a restriction against a plaintiff, or at all, there is no longer 'a substantial threat of real harm' because 'intervening events [have] remove[d] the possibility of harm.'") (alterations in the original) (citations omitted); *Presbytery of N.J.,* 40 F.3d at 1470-71 (dismissing religious challenge to discrimination law as unripe where State indicated, through official's affidavit, that churches would not be prosecuted for violations of the law); *Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 192 (3d Cir.1990) (holding that a claim was not ripe as to certain regulations when there was "an express assurance that there will be no enforcement" of those provisions).

Plaintiffs insist that their current complaints do not rest upon uncertain future events because the Mandate is currently the law, unless and until it is changed. The only uncertainty, Plaintiffs say, is whether the Government can alleviate the threat to their federal rights within a limited timeframe – i.e., prior to the expiration of the safe

---

[9] These facts distinguish the present case from *Korte v. Sebelius*, No. 12-3841 (7th Cir. Dec. 28, 2012) and *Monaghan v. Sebelius*, No. 12-15488 (E.D. Mich. Dec. 30, 2012), both of which were recently cited by Plaintiffs in support of their request for injunctive relief. Because both *Korte* and *Monaghan* involved plaintiffs that were for-profit entities challenging the ACA's contraceptive mandate, the plaintiffs in those cases were not beneficiaries of the safe harbor period and additional rulemaking. *See* 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012). Accordingly, since the issue of ripeness was never joined in those cases, their reasoning does not inform our present analysis.

harbor period.  Ultimately, the viability of Plaintiffs' argument depends upon how we view the Government's professed commitment to engage in further amendment of the Mandate and, in particular, whether we view the Government's assurances in this regard as something that renders the Mandate a mere contingency.

Plaintiffs urge this Court to follow the approach taken by the District Court in *Roman Catholic Archdiocese of New York v. Sebelius, supra.*  In that case, the district court found the plaintiffs' First Amendment and RFRA claims fit for judicial review based on its conclusion that the Mandate, having been formally promulgated in the Federal Register, is not merely a "non-final proposed policy," but rather a "final rule."  2012 WL 6042864 at *21.  Consistent with this conclusion, the court viewed the Defendants' stated intent to engage in further rulemaking as too amorphous to support the defendants' lack-of-ripeness argument.  See id. ("[A]lthough the Court will assume that the consideration that the Departments will conduct pursuant to the ANPRM is real, not merely theoretical, there is no way to tell where that will go; the ANPRM is not a 'concrete plan.'  It is, in fact, only 'directed at possibilities.'").  Critically, the *New York* court considered it "still possible," notwithstanding the defendants' publication of the ANPRM, "that the Coverage Mandate as it is currently structured will become effective at the expiration of the safe harbor."  Id. at *21.

The position taken by the *New* York court appears to be the minority view, however, and numerous other federal courts have interpreted the prospect of the Mandate's enforcement as a mere contingency in light of the Government's stated plan for further rulemaking as it relates to non-exempt religious organizations.  *See Colorado Christian University v. Sebelius,* 2013 WL 93188 at *5 ("In the instant case, Defendants

26

have not only committed to further amend the interim final rule but, in fact, have initiated

a rulemaking process to do so.  Interpreted in a pragmatic way, Defendants' actions

render tentative, as opposed to final, the regulation at issue and Defendants' position on

the issues raised by [plaintiff].”); *Catholic Diocese of Peoria v. Sebelius,* 2013 WL 74240

at *5 (finding that the Government is in the process of amending the preventive service

regulations and that this makes the regulations unfit for judicial review); *University of*

*Notre Dame v. Sebelius,* 2012 WL 6756332 at *3 (stating that, despite the Mandate's

claim to be a final regulation, “events following the regulation's adoption make clear that

it isn't final,” and “defendants have taken prompt and concrete action – the safe harbor

provision – indicating that its rule is subject to reconsideration and modification”); *The*

*Catholic Diocese of Biloxi, Inc. v. Sebelius,* Civil No. 1:12CV158-HSO-RHW (S.D. Miss.

Dec. 20, 2012) (slip op. at p. 13) (“Because the preventive services regulations are in

the process of being amended, in their present form they represent a tentative agency

position.”); *Zubik v. Sebelius,* 2012 WL 5932977 at *8-9 (finding, despite the fact that

the Mandate is “clearly definitive” by virtue of having been promulgated, that the

defendants' stated intention of amending the regulation so as to address plaintiffs'

religious liberties concerns rendered the plaintiffs' claims unripe); *Catholic Diocese of*

*Nashville v. Sebelius,* 2012 WL 5879796 at *5 (“Because the preventive services

regulations are in the process of being amended, they are by definition a tentative

agency position in which the agency expressly reserves the possibility that its opinion

might change and, therefore, are not fit for judicial decision at this time.”); *Wheaton*

*College v. Sebelius,* 2012 WL 3637162 at *8 (“Because they are in the process of being

amended … the preventive services regulations are by definition a tentative agency

position 'in which the agency expressly reserves the possibility that its opinion might

change.'") (citations omitted); *Belmont Abbey College,* 2012 WL 2914417 at *12

(concluding that "the Departments' position on the policy at issue remains

indeterminate"); *Nebraska ex rel. Bruning v. U.S. Dept. of Health and Human Services,*

2012 WL 2913402 at *22 (court agreeing with plaintiffs that the Mandate should be

considered "definitive" by virtue of its formal promulgation, but concluding that "[t]his fact

carries little significance … given the tentative nature of the Departments' position on

religious accommodations to the ACA's contraceptive coverage requirements").

Recently, the Court of Appeals for the D.C. Circuit addressed the ripeness issue

in the consolidated appeals of *Wheaton College* and *Belmont Abbey College.  See*

*Wheaton College v. Sebelius,* Nos. 12-5273  and 12-5291 (D.C. Cir.  Dec. 18, 2012).

After acknowledging the Departments' creation of a safe harbor period and their stated

intent to engage in further amendment of the Mandate prior to the end of the safe

harbor period (as set forth in the February 15, 2012 Final Rule and the March 21, 2012

ANPRM), the Court of Appeals observed that the Government had, at oral argument,

gone "further."  Id. at p. 2.  "First," the Court noted, the Government had "represented to

the court that it would *never* enforce [the Mandate] in its current form against the

appellants or those similarly situated as regards contraceptive services" and instead, a

"different rule" would be applied to them – a representation which the Court of Appeals

interpreted as a "binding commitment."  Id.  Moreover, the Court noted, the Government

had "represented that it would publish a Notice of Proposed Rulemaking for the new

rule in the first quarter of 2013 and would issue a new Final Rule before August 2013."

Id.  "Based expressly upon the understanding that the government will not deviate from

28

its considered representations," the Court of Appeals concluded that "the cases are not

fit for review at this time because '[i]f we do not decide [the merits of appellants'

challenge to the current rule] now, we may never need to.'"  Id. at 2 (alterations in the

original) (*quoting American Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir.

2012)).[10]

In their supplemental memorandum discussing the *Wheaton* and *Belmont Abbey*

*College* appeal, Defendants essentially reiterate their promise that:  (1) "the regulations

will never be enforced in their present form against entities like the plaintiffs in those

cases or plaintiffs here" and (2) the Defendants "will finalize amendments to the

regulations in an effort to accommodate religious organizations with religious objections

to contraceptive coverage before the rolling expiration of the safe harbor begins in

August 2013."  (Defs.' Resp. to Pls.' Notice of Suppl. Auth. [ECF No. 53] at p. 1.)  Based

on these representations, we, like the majority of other courts cited above, view the

Defendants' promise to engage in further rulemaking as a good faith, binding

commitment which effectively renders the Mandate a "non-final" agency action, at least

insofar as it relates to religious organizations like the Plaintiffs.  *See Belmont Abbey*

*College, supra,* at * 9 (collecting cases in support of the proposition that agencies are

presumed to act in good faith).  See also Colorado Christian University, supra, at *7

(rejecting the argument, adopted in *Roman Catholic Archdiocese of New York,* that the

preventative services coverage Mandate is "final" for purposes of ripeness and

explaining that the Defendants have finalized the religious employer exemption but have

---

[10] The Court of Appeals went on to hold the appeals before it in abeyance (rather than dismiss them),
pending regular updates from the Government on the status of its ongoing rulemaking efforts.  Like the
district court in *Colorado Christian University,* 2013 WL 93188 at *8, we will adhere to the customary
practice of dismissing this unripe case in its entirety, rather than holding it in abeyance.

never finalized the mandate itself).  Accordingly, Plaintiffs face no realistic scenario of imminent injury resulting from enforcement of the Mandate as it currently exists.

Once the forthcoming amendments to the Mandate are finalized, and assuming Plaintiffs' concerns are not sufficiently ameliorated, they "will have ample opportunity [ ] to bring [their] legal challenge at a time when harm is more imminent and more certain." *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 734 (1998).  For present purposes, however, Plaintiffs' claims are not ripe for adjudication because they "rest[ ] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" *Texas v. United States,* 523 U.S. 296, 300 (1998) (citations omitted), and because "the possibility that future consideration will actually occur before [implementation] is not theoretical but real."  *Ohio Forestry Ass'n, Inc.,* 523 U.S. at 735.

Plaintiffs insist that, regardless of the form the Mandate may ultimately take in the future, they are suffering a litany of injuries right now from the existing regulatory scheme and the harm to them will continue until this Court resolves their claims.  For example, Plaintiffs maintain that they have an immediate need to know their obligations relative to the Mandate because they are presently assessing and negotiating their budgets and health insurance plans, which must be finalized in advance of the next open enrollment season beginning in November 2013.  Specifically, Plaintiffs are weighing the costs of compliance with the Mandate versus the cost of non-compliance. (See Murphy Affidavit [ECF. No. 24-3] at ¶ 25.)  Plaintiffs also fear the loss of donations from local businesses should their commercial benefactors be fined at some point for their own non-compliance with the Mandate or should they feel that the Plaintiffs are not acting in accordance with Catholic doctrine.  Plaintiffs further contend that Catholic

Charities cannot finalize its plans to expand its social services programs in light of the potential fines to which Plaintiffs may be subjected.  In addition, Plaintiffs say that the anticipated rulemaking schedule does not afford them enough time to make any necessary changes to their health plans, to adjust their budgets, and to litigate.

Although the ripeness inquiry encompasses consideration of the hardship to the parties that would result from withholding judicial review, *Abbott Laboratories,* 387 U.S. at 152, it is also the case that "[m]ere economic uncertainty affecting the plaintiff's planning is not sufficient to support pre-mature review."  *Wilmac Corp. v. Bowen,* 811 F.2d 809, 813 (3d Cir. 1987).  *Accord Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747, 751 (D.C. Cir. 1984) (plaintiff's "planning insecurity" was insufficient to establish hardship); *Bethlehem Steel Corp. v. EPA,* 536 F.2d 156, 162 (7th Cir. 1976) ("claims of uncertainty in [plaintiff's] business and capital planning are not sufficient to warrant [ ] review of an ongoing administrative process").

Accordingly, a number of courts have found the types of injuries alleged here to be insufficient for purposes of satisfying the ripeness requirement in cases where non-exempt religious organizations were challenging the preventive services coverage mandate.  *See, e.g., Colorado Christian University, supra,* at *8 (plaintiff's "present planning for future eventualities" did not establish hardship for purposes of ripeness inquiry where the planning stemmed from plaintiff's "ongoing speculation that Defendants will fail to amend the [Mandate] in a satisfactory manner"); *University of Notre Dame, supra,* at *4 (rejecting, in the context of standing, plaintiff's claim of injury stemming from plaintiff's professed need for time to prepare for compliance with the Mandate or its replacement; court finding that injury flowed not from the Mandate but

from the brevity of the safe harbor period); *Catholic Diocese of Nashville, supra,* at *5 ("[T]he planning insecurity Plaintiffs advance with regard to what the preventive services regulations may or may not require of them does not suffice to show hardship."); *Zubik, supra, at* *9 (stating that "the mere fact that a declaratory judgment would be useful to assist Plaintiffs in making their upcoming operational decisions is insufficient to overcome the fact that no actual controversy yet exists between the parties"); *id.* at *11 (in the context of standing, plaintiffs could not demonstrate injury in fact based on allegations that uncertainty from the Mandate was interfering with their need for lead time to arrange their health care plans, their ability to enter into collective bargaining agreement negotiations, and their ability to set tuition rates and make teacher retention decisions); *Wheaton College, supra,* at * 8 (costs stemming from plaintiff's "desire to prepare for contingencies" and the "planning insecurity" which allegedly resulted from uncertainty as to what the preventive services regulations might require of the plaintiff were insufficient to establish hardship for purposes of the ripeness inquiry) (quoting *Belmont Abbey College, supra,* at *14).

Plaintiffs also claim injury by virtue of the fact that the Diocese is being required by its Third Party Administrator to sign an agreement indemnifying the TPA against any costs that may be incurred with respect to the TPA's obligations to comply with the Mandate. More specifically, the Diocese has instructed its TPA not to comply with the terms of the Mandate, and the TPA has asked the Diocese to agree to indemnify it for losses it may incur in complying with the Diocese's instructions. (See Murphy Affidavit, Ex. B [ECF No. 24-3] at 16-17.) According to Plaintiffs, the indemnity agreement

applies to broad categories of costs for potentially staggering amounts of money and may expose the Diocese to significant liability.

This potential liability, however, is completely dependent upon contingent events, namely that:  (a) the amended form of the Mandate will fail to alleviate the Plaintiffs' religious concerns and (b) will not be complied with by the Diocese's TPA, resulting in (c) third party claims for which the Diocese is ultimately liable.  Such contingencies are too speculative to support a finding of ripeness.  Moreover, to the extent the claimed harm is the Diocese's discomfort in having to decide whether or not to sign the indemnity agreement, this represents but another form of "[m]ere economic uncertainty affecting the plaintiff's planning" which "is not sufficient to support pre-mature review." *Wilmac Corp., supra,* at 813.

Plaintiffs also claim a number of injuries stemming from the exemption pertaining to "religious employers."[11]  Unlike the contraceptive services mandate, the "religious employer" exemption does not appear to be the subject of further rulemaking and may therefore be considered a "final" regulation insofar as it relates to (and apparently excludes) religious organizations like the Plaintiffs.  Seizing on this distinction, Plaintiffs have articulated a number of ways in which, they claim, they are harmed by the now

---

[11] To reiterate, the regulations allow for a "religious employer" to be exempted from the Mandate, and they define that term as "an organization that meets all of the following criteria:

    (1) The inculcation of religious values is the purpose of the organization.

    (2) The organization primarily employs persons who share the religious tenets of the organization.

    (3) The organization serves primarily persons who share the religious tenets of the organization.

    (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."

*See* 45 C.F.R. § 147.130 (a)(1)(iv)(B) (effective Aug. 3, 2011).

"final" – and (in their view) unconstitutionally narrow – exemption applicable to religious employers.

They assert, for example, that the Diocese is being required to truthfully certify to its TPA whether or not it satisfies the regulatory definition of a "religious employer" for purposes of the exemption.  According to Plaintiffs, any certification in this regard may impact the scope of Plaintiffs' current TPA services as well as attempts by the Diocese to later claim the exemption.  Because the Diocese does not feel it can truthfully state that it "primarily employs" or "serves primarily" persons who share its "religious tenets," Plaintiffs believe that the Diocese cannot presently claim "religious employer" status; however, they fear that failure to claim such status now may jeopardize the Diocese's ability to claim the exemption at a later time.  Alternatively, they say, a failure by the Diocese to complete the exemption form as requested may jeopardize its relationship with its TPA.

In addition, Plaintiffs claim that they are being harmed in that the Diocese is unable to determine whether to participate in a particular scholarship program that would require the imminent recruitment of students, both Catholic and non-Catholic. Plaintiffs fear that, should the Diocese involve itself in the recruitment program now, it may be precluded from claiming the religious employer exemption later, since many non-Catholic students would benefit from the program.

In a similar fashion, Plaintiffs state that they are in danger of losing federal grant monies on account of the manner in which the religious employer exemption has been formulated.  Because the Plaintiffs' federal grants are conditioned upon a certification that Plaintiffs do not discriminate on the basis of religion, Plaintiffs believe that they

would be in violation of this provision – and, thereby stand to lose substantial federal funding – should they have to alter their practices in the future for the benefit of the religious employer exemption.

At bottom, all of these professed harms stemming from the allegedly unconstitutional definition of "religious employer" share a common premise:  the assumption that Plaintiffs' religious liberties can *only* be adequately accommodated by exempting them from the Mandate altogether rather than by altering the terms of the Mandate itself.  However, that assumption is unwarranted given that the future form of the Mandate is as yet unknown.  Indeed, this uncertainty precisely illustrates why the pending dispute is unfit for review.  *See Colorado Christian University, supra,* at *8 (rejecting plaintiff's claims of hardship which stemmed from its ongoing speculation that defendants will fail to amend the interim final rule in a satisfactory manner, especially in light of defendants' stated intent to amend the rule so as to accommodate the plaintiff's religious concerns); *University of Notre Dame, supra,* at *4 (noting that, while it is possible that the future form of the Mandate might cause the plaintiff to violate its Catholic beliefs, "no one can say because that future rule hasn't been promulgated"); *Wheaton College, supra,* at *8 ("Wheaton's argument that various hypothetical accommodations are insufficient … only serves to underscore why this Court ought not address the merits of Wheaton's claims until the preventive services regulations 'have taken on fixed and final shape so that [the Court] can see what legal issues it is deciding.'") (alteration in the original) (citation omitted); *Belmont Abbey College, supra,* at *13 (rejecting as "speculative" plaintiff's assumption that the proposed accommodation set forth in the ANPRM will necessarily be the final rule; noting that "the

contents of the final amendment have not yet been decided" and "[i]t would thus be

premature to find that the amendment will not adequately address Plaintiff's concerns").

Finally, since it appears that the definition of a "religious employer" (and therefore

the exemption to which it applies) will likely not change via the rulemaking process,

Plaintiffs have attempted to frame their complaint partially as an attack on the definition

of "religious employer" itself, which Plaintiffs claim is unconstitutionally narrow.  In this

regard, Plaintiffs' counsel suggested at oral argument that the definition of "religious

employer" as set forth in the Defendants' February 2012 regulations could become an

insidious gateway for future regulation of Catholic affairs, since the Diocese and its

affiliated religious organizations can never meet this narrow definition of a "religious

employer" without fundamentally altering their practices and violating core religious

beliefs.

We find unavailing this attempt by Plaintiffs to decouple their objections relative

to the Mandate from their objections concerning the exemption for religious employers.

In light of the manner in which the regulatory scheme has been constructed, the

objected-to definition of "religious employer" is expressly limited to the context of

required preventive care and screenings for women – i.e., the contraceptive Mandate,

and cannot reasonably be read as having application outside the context of that

particular regulation.  *See* 45 C.F.R. §147.130(a)(iv)(A) and (B).  The ANPRM

buttresses this conclusion by emphasizing that

> this religious exemption is intended *solely* for purposes of the
> contraceptive coverage requirement pursuant to section 2713 of the PHS
> Act and the companion provisions of ERISA and the [Internal Revenue]
> Code.  Whether an employer is designated as "religious" for these
> purposes is not intended as a judgment about the mission, sincerity, or

> commitment of the employer, and the use of such designation is limited to defining the class that qualifies for this specific exemption.  The designation will not be applied with respect to any other provision of the PHS Act, ERISA, or the Code, nor is it intended to set a precedent for any other purpose.

Certain Preventive Services Under the Affordable Care Act (ANPRM), 77 Fed. Reg. at 16502 (emphasis in the original).

Consequently, it makes no sense to adjudicate the meaning of the religious employer exemption separate and apart from the Mandate itself, as the Mandate is the *only* context in which that particular definition of "religious employer" can have meaning. Additionally, for the reasons discussed at length above, Plaintiffs' alleged harms relative to their exclusion from the "religious employer" exemption are all premised on the fundamental assumption that their religious liberties can *only* be adequately accommodated by exemption, as opposed to amendment of the Mandate itself.  That issue, however, is not one that is presently fit for judicial review.

For all of the foregoing reasons, this Court concludes that the interests of the parties are not sufficiently adverse at this juncture to support a finding of ripeness.

### 2. Conclusiveness of the Judgment

The conclusiveness prong of the ripeness inquiry addresses "whether the parties' rights will be definitively decided by a declaratory judgment." *Step–Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 649 n. 9 (3d Cir. 1990).  "If a declaratory judgment is based on a contingency, however, it fails to change the parties' legal status, and becomes an exercise in futility." *Zubik, supra,* at *9 (citing *Step Saver,* 912 F.2d at 649).

For the same reasons previously discussed in relation to the "adversity of interests" inquiry, I find that the second ripeness prong is also unsatisfied.  That is, no judgment can be entered by this Court that would definitively decide the rights of the parties because the final form which the challenged regulation will take is as yet undetermined.  Because the Defendants insist that the present form of the Mandate will not be enforced against the Plaintiffs or other similar religious organizations, any adjudication by this Court concerning the Mandate, as it exists today, would represent a waste of judicial resources.  *See, e.g., Zubik, supra,* at *9 ("In this lawsuit, even if Plaintiffs received the declaratory judgment they seek at this time, it would not affect their rights unless Defendants sought or threatened to bring an enforcement action against them.  Since this has not occurred, and cannot occur under current law before January 2014, the issuance of a declaratory judgment would be futile."); *Catholic Diocese of Nashville, supra,* at *5 (finding that "adjudicating Plaintiffs' claims now would undermine the interests of judicial economy as it would require the court to review the [Mandate] before it is amended and before it is to be enforced" and "would deny the defendants a full opportunity to consider Plaintiffs' objections and to modify the Government's positions").

Moreover, as Defendants point out, any attempt by this Court to adjudicate possible future amendments to the Mandate would be too speculative to yield meaningful review.  It would also defeat one of the rationales of the ripeness doctrine – specifically, "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also

to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way."  *Abbott Labs,* 387 U.S. at 148-49.

Plaintiffs contend that the relevant inquiry for present purposes is whether the issues in dispute are predominantly legal.  In *Presbytery of New Jersey,* our Court of Appeals observed that, for purposes of the conclusivity-of-judgment prong, the usual requirement of a concrete set of facts "has some play in the joints" and is not so important where "the question is 'predominantly legal.'"  40 F.3d at 1463-64.  Here, Plaintiffs argue, the only potential missing "fact" is a possible change in the law which, they insist, is legally insufficient to undermine the ripeness of their claims.  They consider the current form of the Mandate to be a "final" rule and contend that this Court should not accept the Defendants' "blithe 'trust us—we'll fix it later' assertions that the ANPRM will resolve all of Plaintiff's difficulties."  (Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss [24] at p. 30.)  They view the ANPRM's promise of future rulemaking as "merely a speculative potential future change."  (Id. at 30-31.)

As we have previously discussed, however, Plaintiffs' view – as espoused by the district court in *Roman Catholic Archdiocese of New York,* is the minority view and one with which we disagree.  The majority of courts which have entertained similar lawsuits by non-exempt religious entities have viewed the Mandate, in its present form, as a "non-final," tentative agency action in light of the rule-making process which is, even now, unfolding.  *See* cases discussed, *supra,* at pp. 26-28.  Thus, the "only missing fact" at issue here – i.e., the question of what form the Mandate will ultimately take, is a critical one which precludes meaningful, conclusive review.

3.  Utility

39

Finally, we consider the extent to which a declaratory judgment would be useful to the parties in this case.  Unlike the conclusivity inquiry, which addresses whether the parties' rights will be definitively decided by a declaratory judgment, the utility inquiry addresses whether the parties' plans of action will likely be affected by a declaratory judgment.  *See Step-Saver Data Systems, Inc.,* 912 F.2d at 650 n.9.  As our circuit court of appeals has explained, "[o]ne of the primary purposes behind the Declaratory Judgment Act was to enable plaintiffs to preserve the status quo before irreparable damage was done," and therefore, "a case should not be considered justiciable unless 'the court is convinced that [by its action] a useful purpose will be served.'"  *Id.* at 649 (second alteration in the original).

In their complaint, Plaintiffs seek an order vacating and/or enjoining the Mandate.  They also seek a declaratory judgment stating that the Mandate violates their rights under RFRA and the First Amendment as well as the provisions of the APA.  In other words, Plaintiffs essentially seek an order that places them in the position they enjoyed prior to enactment of the ACA.

Such an order, however, would have little utility in light of the fact that (1) the safe harbor period official precludes enforcement of the Mandate against the Plaintiffs until at least January 2014; (2) Defendants have committed to finalizing an amended form of the Mandate by August 2013; (3) Defendants have committed to publishing the new proposed amendment during the first quarter of 2013; and (4) Defendants have essentially guaranteed that the Mandate, in its current form will never be enforced against these Plaintiffs (or other similarly situated religious entities).  Under these circumstances, the declaratory relief sought in the complaint would be redundant insofar

40

as it relates to the Mandate in its current form and would not preclude the Defendants from promulgating an amended form of the Mandate in any event.  *See Colorado Christian University,* 2013 WL 93118 at *7 (until the pending amendment to the interim final rule is completed, "the Court's review could encompass, at most, the current amended interim final rule, which would be highly inefficient since it will be altered again soon."); *Zubik*, 2012 WL 5932977 at *9 (holding that "a declaratory judgment would be of remarkably little utility at this stage" because, to the extent it would aid Plaintiffs' operational planning, "the mere fact that a declaratory judgment would be useful to assist Plaintiffs in making their upcoming operational decisions is insufficient to overcome the fact that no actual controversy yet exists between the parties.").

Accordingly, we find that declaratory relief in this case would provide little, if any, utility at this stage.

### B. Plaintiffs' APA Claims

Plaintiffs claim that, even if their RFRA and First Amendment claims are not presently ripe for review, their APA claims are.  We disagree.

Section 704 of the APA provides that a "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."  5 U.S.C. § 704. Although the APA does not, by its terms, explicitly define what qualifies as "final" agency action, the "core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *see also Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (noting that agency action is final if:  (1) it marks the consummation of the decisionmaking process – i.e., it must not be of a "merely

tentative or interlocutory nature"; and (2) rights are determined or legal consequences flow from the action).  Thus, "a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."  *Nat'l Park Hospitality Ass'n v. Dept. of the Interior*, 538 U.S. 803, 808 (2003) (citation omitted).

For the reasons previously discussed at length herein, this Court concludes that the Mandate, in its present form, cannot be considered a "final agency action" for purposes of review under the APA.[12]  Further, to the extent Plaintiffs seek review of the "religious employer" exemption, their complaints cannot be segregated from

---

[12] On this point, we find ourselves in agreement with the conclusion reached by the court in *Zubik v. Sebelius, supra.*  Noting that "[c]ourts have been pragmatic when interpreting the finality element of ripeness under the APA," 2012 WL 5932977 at *13 (citations omitted), the *Zubik* court considered the following "finality factors":  (1) whether the decision represents the agency's definitive position on the question; (2) whether the decision has the status of law with the expectation of immediate compliance; (3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; (4) whether the decision involves a pure question of law that does not require further factual development; and (5) whether immediate judicial review would speed enforcement of the relevant act.  *See id.* (citing *Solar Turbines Inc.* v. Seif, 879 F.2d 1073, 1080 (3d Cir. 1989)).  The court then found that:

each of these factors weighs against a determination that Plaintiffs' claims are ripe.  First, while the regulations are "final," by virtue of having been formally promulgated, the regulations do not represent the Defendants' "definitive position on the question" as Defendants have initiated a formal amendment process of these regulations.  Second, as discussed at length supra, at the current time there is no expectation of immediate compliance by either Plaintiffs or Defendants.  Third, any decision the Court would make today would not have an immediate impact on Plaintiffs' day-to-day operations as the existing regulations are currently under review and are expected to be modified. Next, any decision clearly requires further factual development as the current controversy at this time is based on contingent facts.  Finally, immediate judicial review would not speed enforcement as Plaintiffs are not subject to any potential enforcement action before January 2014, if at all.

2012 WL 5932977 at *13.

consideration of the Mandate itself, and it cannot be said that they presently face any harm or threat of harm from that particular aspect of the regulation.

For these reasons, the Court finds that the Plaintiffs' claims under the APA are not ripe for adjudication at this time.

### C. Standing

Defendants have made the alternative argument that this Court lacks subject matter jurisdiction over the pending case based upon the Plaintiffs' alleged lack of standing.  Because our conclusion as to lack of ripeness is dispositive, we need not consider this alternative basis for dismissal.  *See Colorado Christian University,* 2013 WL 93188 at *9 (declining to address defendants' standing arguments where case was not ripe for review); *Catholic Diocese of Biloxi,* supra, at *12 (same).

## V.   CONCLUSION

Based upon the foregoing reasons, this Court concludes that the within action is not ripe for judicial review.  Because Plaintiffs have failed to meet their burden of establishing subject matter jurisdiction, this matter will be dismissed in its entirety without prejudice.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MOST REVEREND LAWRENCE )
T. PERSICO, BISHOP OF THE )
ROMAN CATHOLIC DIOCESE )
OF ERIE, as Trustee for the )
Roman Catholic Diocese of Erie, )
A Charitable Trust, *et al.* )
                                              )
            Plaintiff,              )          Case No. 1:12-cv-123-SJM
                                              )
      v.                            )
                                              )
KATHLEEN SEBELIUS, in her )
official capacity as Secretary of the )
U.S. Department of Health and )
Human Services, *et al.*, )
                                              )
            Defendants.          )

**O R D E R**

AND NOW, to wit, this 22nd Day of January, 2013, for the reasons set forth in the

accompanying Memorandum Opinion,

IT IS ORDERED that the Defendants' Motion to Dismiss for lack of subject matter

jurisdiction [ECF No. 17] shall be, and hereby is, GRANTED.  Accordingly, all counts of

Plaintiffs' complaint are hereby DISMISSED without prejudice pursuant to Rule 12(b)(1)

of the Federal Rules of Civil Procedure, and the case shall be marked "CLOSED."


                              s/      Sean J. McLaughlin

                                      Sean J. McLaughlin
                                      United States District Judge


cm:      All counsel of record.

44